TONY ALLEN LOCASTRO                                                                    PLAINTIFF

VS.                                                                    CAUSE NO. 1:17-CV-187-M-P

WHITE COMMUNICATIONS, LLC                                                            DEFENDANT

## ORDER

This cause comes before the court on the motion of defendant White Communications, LLC ("White") for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Tony Allen Locastro has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion is well taken and should be granted.

This is a disability discrimination case arising out of plaintiff's termination from his position as an IT manager for defendant White, a company which serves as a contractor providing installation services to Directv. It is undisputed that plaintiff is disabled, based on, *inter alia*, post-traumatic stress disorder ("PTSD") and arthritis in his leg following an incident in which he was electrocuted while serving in the Navy. Plaintiff has sought a variety of federal disability benefits, with mixed results. Plaintiff was deemed 100% disabled by the Veteran's Administration ("VA"), but his applications for Social Security disability benefits were denied.

In August 2014, plaintiff began working as an IT manager for White, with the understanding that he would be doing most of his work remotely from his home in Fulton, Mississippi, with only occasional travel required to defendant's home office in Iowa. Plaintiff testified in his deposition, however, that beginning in late 2015, defendant's general manager Jeff White began asking him to move to Iowa, where he could perform additional services which

he could not perform remotely. In June 2015, plaintiff finally notified White that he would be unable to move to Iowa, citing his own disability and that of his autistic son.

Plaintiff was laid off in August 2016, and he contends that he was terminated based upon his refusal to move to Iowa. For its part, defendant maintains that it fired plaintiff not for any disability or for his refusal to move to Iowa, but because it decided to eliminate its entire IT department, including plaintiff's position, after it underwent a so-called "tech acquisition" with a company called Synergies. During this tech acquisition, Synergies purchased White's tech assets, site managers, and offices and, in exchange, defendant received an ownership interest in Synergies. White had been discussing this tech acquisition with Synergies since March 2015, and it finally went forward in September of 2016. During and after the tech acquisition, defendant laid off all of its staff, including Locastro, with the exception of the retail staff and back office employees who supported Synergies. Based upon this and other evidence, defendant has presently moved for summary judgment, arguing that no genuine issue of fact exists regarding its potential liability and that it is entitled to judgment as a matter of law.

After considering the parties' arguments, this court concludes that plaintiff's ADA claims in this case fail for two, independently sufficient, reasons. First, plaintiff has failed to establish that he was qualified for the job in question, based upon his own deposition testimony and sworn statements which he made in the course of applying for disability benefits. Second, this court concludes that, even assuming that plaintiff was qualified, continuing to work remotely from Mississippi as a salaried employee was not a reasonable accommodation for his disability, in light of the drastically changing circumstances at the company. This court discusses these two conclusions in sections I and II below. Additionally, this court notes in section III that there are serious factual and legal weaknesses in plaintiff's attempts to connect his refusal to move to

Iowa to his own disability or to that of his son. While this court does not grant summary judgment on the basis of these weaknesses, it does note them for the record.

## I. Was plaintiff qualified for his position?

In the court's view, the first reason why plaintiff's ADA claims in this case fail is because the evidence developed in discovery conclusively demonstrates that he was not qualified for the position he occupied. To be considered "qualified" under the ADA, the plaintiff must show that he is able to perform the essential functions of the relevant position with or without reasonable accommodation. *Credeur v. La. ex rel. Office of Attorney Gen.*, 860 F.3d 785, 792 (5th Cir. 2017) (quoting 42 U.S.C. § 12111(8)); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996) (The Fifth Circuit has "defined an otherwise qualified person as one who is able to meet all of the program's requirements in spite of his handicap.") The relevant time for determining whether an employee can perform the essential functions of the job is at the time the position was eliminated. *Amsel v. Texas Water Dev. Bd.*, 464 F. App'x 395, 400 (5th Cir. 2012).

"'Essential functions' are 'fundamental[,'] as opposed to 'marginal[,'] job duties, 29 C.F.R. § 1630.2(n)(l), such that a job is 'fundamentally altered' if an essential function is removed." *Credeur*, 860 F.3d at 792 (alterations omitted). Determining whether a function is "essential" is done on a case-by-case basis. *Id.* The ADA provides where this inquiry should begin:

> For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

This court notes that the qualification analysis in this case is rather unique, since defendant acknowledges that it *believed* that plaintiff was qualified for his position while he was working for it, and it is only plaintiff's own statements uncovered in discovery which changed its views in this regard. And, indeed, plaintiff's statements are highly damaging to his ADA claims, since he clearly and repeatedly asserted that he was not qualified for his job and that he only managed to deceive his employer regarding this issue because he was working remotely.

In the court's view, plaintiff's sworn statements in his deposition and in his applications for disability benefits read something like an inverse job interview, pursuant to which the applicant does his very best to assure the employer that he is *not* the right man for the job. In his deposition, plaintiff appeared to "touch all the bases" regarding his lack of qualification to be an IT manager, beginning with his repeated insistence that he has no interest in computers or "anything electronic." Specifically, plaintiff testified in his deposition that:

> A: I rarely touch a computer if I have to - if I don't have to at home. That's the last thing that I will touch, is computers. I hate computers. Or anything electronic, for that matter.
> Q: And that's currently?
> A: Yes, sir.
> Q: Okay. And how long has that been a problem?
> A: It has gotten worse over the past couple of years, but it was already getting that way while I worked at White Communications.
> Q: Okay.

[Plaintiff's Dep. at 75]. While plaintiff is to be commended for his candor, it is difficult for this court to imagine an admission which is much more damaging, on the qualification issue, than an IT manager admitting that he "hates computers" and has lost interest in "anything electronic."

Later in his deposition, plaintiff appeared to do this admission "one better." While discussing the nature of his disability, plaintiff flatly testified that he is unable to do his job and,

crucially, that he lost that ability approximately a year into his tenure at White.  Specifically,

plaintiff testified that:

> Q: Okay.  Do you believe that you can no longer do the job that you once had at White Communications?
> A: Yes, I do.
> Q: You believe you can't?
> A: I believe that I cannot do that job.
> Q: Okay. Whether you were in Mississippi or Iowa, right?
> A: That's correct.
> Q: When do you believe you became unable to perform that job?
> A: I believe it was right before the – the server changeover in Iowa, which was probably about a year into it.
> Q: So at that point going forward, you believe that the issues that you are currently dealing with and form the basis of your disability application, those issues were such that it was too difficult for you to do the job at White Communications?
> A: Yes, sir.
> Q: Did you ever tell anybody at White Communications that you thought you couldn't do the job any more?
> A: No, sir.

[Plaintiff's Dep. at 170-71].

In his brief, counsel for plaintiff does his best to explain away these highly damaging

admissions, but without much luck.  Counsel first argues that, since defendant was unaware of

the effect of plaintiff's disability on his ability to focus and his basic interest in the job, he should

be deemed qualified for the position.  It is certainly true that plaintiff is able to point to positive

job evaluations which he received from defendant, but plaintiff himself offered an explanation

for this fact when he was applying for federal benefits.  In a Work Activity Report which he

prepared while (unsuccessfully) applying for Social Security disability benefits, plaintiff wrote

that:

> I worked remotely from home.  Due to my mental problems I was unable to concentrate and stay focused and probably only worked an hour a day.  My employer was in another state so they had no way of knowing what I was doing.  They assumed the work was being done, and I just let them believe that.

[Defendant's exhibit N at 6].

Thus, the record in this case supports a conclusion that plaintiff was able to mount a successful deception of his employer, whereby he managed to keep it in the dark regarding his inability to do his job. Plaintiff now essentially seeks to be rewarded for this deception, by having himself deemed qualified based on what he led his employer to *believe*, even though he now makes it clear that this belief was erroneous. Unsurprisingly, plaintiff offers no authority for the proposition that an employer's *belief*, based upon admittedly erroneous information, may establish qualification for a position when the plaintiff himself makes it clear that he was not qualified for it. This court would be rather surprised if any such authority existed, since it seems clear that the relevant factor in this context is plaintiff's *actual* qualification, and not the defendant's prior belief, based upon inaccurate information. In so stating, this court notes that one remedy which plaintiff seeks in this case is reinstatement. [Complaint at 4]. Thus, plaintiff seeks for this court to order defendant to re-hire him to do work which, he has repeatedly assured it, he is not qualified, and, indeed, to which he has a strong aversion. This court also notes that the fact that no events occurred during plaintiff's rather brief tenure which demonstrated his lack of qualification does not mean that no such incidents would have arisen during the period in which he now seeks backpay.

This court now turns to plaintiff's second argument on the qualification issue, namely that he was able to do the job with assistance from his wife. However, plaintiff undercuts his own argument in this regard by making it clear that his wife only provided limited assistance, regarding "menial" tasks. Specifically, plaintiff writes in his brief that:

> Defendant brings up the fact that Locastro's wife assisted him in ordering, doing PowerPoint presentations, and other paperwork because of his difficulty in focusing. While it is true that Locastro testified to such, Locastro was able to get the job done with his wife's assistance. Further, she did not assist him with the technical aspects of the job. Locastro worked at home, and it was a reasonable accommodation for his wife to assist

6

him in menial tasks that he had difficulty doing, because of his PTSD, and his difficulty in focusing.

[Plaintiff's brief at 19-20]. Plaintiff thus suggests that he and his wife should be considered a "team" for the qualification issue, but it is far from clear to this court that this is correct, since the issue is plaintiff's qualification for the position, and not hers.

Even assuming that assistance from plaintiff's wife may be considered in assessing his qualification, any such help which she provided on menial, non-technical matters does not address plaintiff's admitted inability to focus on, and complete lack of interest in, anything electronic or computer-related. Without question, these are core requirements of the IT Manager position, and any assistance which his wife might offer regarding menial and non-technical matters does not render him qualified for the position. Indeed, it seems clear to this court that the position of IT manager is a skilled, non-menial position, and plaintiff specifically testified that it was the *technical*, and not menial, aspects of the jobs which gave him the most trouble. Plaintiff would have a stronger argument for considering his wife's assistance if he had testified that he retained an interest in and ability to focus on technical aspects of his job, but merely had trouble performing menial tasks. As discussed above, however, such was not his testimony.

As a final argument, counsel contends that this court should not consider plaintiff's statements made while applying for social security benefits, since the standard for disability in that context differs from the one in ADA cases. While that may be true, the issue in this context is not whether plaintiff is disabled under the ADA, since defendant concedes that he is. Rather, the issue is whether plaintiff is *qualified* for his position in spite of his disability, and it is on this issue which his prior statements are so damaging. Plaintiff's statements made while seeking disability benefits aside, his deposition testimony in this case strikes this court as being even more damaging than those he made while seeking federal benefits. In particular, plaintiff's flat

assertion in his deposition that "I believe I cannot do that job" regardless of "whether [he was] in Mississippi or Iowa" seems clear enough, under any legal standard, and it leaves little room for him to argue that his words have been misconstrued by defendant.

In light of the foregoing, this court concludes that it should take plaintiff at his word that he lacked any interest in, or ability to do, his job and that defendant's belief otherwise was an erroneous one which he was able to foster based on the lack of supervision he encountered while working remotely. Plaintiff would now have this court order defendant to resume that deceitful employment relationship, but it is unwilling to do so, for reasons which should be obvious. In so stating, this court notes once again that defendant laid off its entire IT staff following the tech acquisition with Synergies, which provides it with a strong argument that it made a business decision to no longer employ salaried IT workers, regardless of any issues involving plaintiff's disability. That being the case, it would be anomalous indeed for this court to order defendant to make "one exception" to this business decision for an individual who, we now know, has no interest in the position and, by his own admission, is not qualified to do it. This court therefore concludes that summary judgment is in order on the qualification issue alone, and it now addresses a second basis for summary judgment, involving the reasonable accommodation issue.

## II. Did defendant fail to reasonably accommodate plaintiff's disability, or that of his son?

This court now considers whether, assuming that plaintiff was qualified for his position, defendant had a legal obligation to accommodate his disability by allowing him to continue to work from Mississippi as a salaried employee. In considering this issue, this court first notes that

the ADA prohibits employers from "discriminating against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination includes the failure to make "reasonable accommodations to the known physical ... limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).

In addressing these issues, this court first emphasizes that plaintiff essentially argues that defendant was legally required to offer not one, but two, major accommodations in this case. First, plaintiff argues that he should have been allowed to continue working remotely from Mississippi, and, second, that defendant should have retained him as its only salaried IT employee, even though it had made a business decision to eliminate its entire IT staff in favor of paying an outside contractor to provide necessary IT services.[1] As discussed below, it is not clear to this court that defendant was legally required to offer plaintiff either of these two accommodations, but it seems abundantly clear that it was not required to offer them both.

---

[1] It can be argued that this second issue is not best considered under the rubric of reasonable accommodation, but, rather, in simply analyzing the reasons for plaintiff's termination. This court has elected to address it in the context of reasonable accommodation, since plaintiff is essentially asking to be treated differently than defendant's other IT employees (who were all laid off), and his disability is the only basis upon which he might demand such preferential treatment. This strikes this court as being, in essence, a reasonable accommodation argument.

Regardless, the same facts, discussed below, which indicate that defendant laid off its IT workers for valid business reasons plainly support a conclusion that plaintiff would have lost his job regardless of any disability. Under that analysis, plaintiff would find himself lawfully terminated, and the issue of reasonable accommodation would be moot, since he would have no job regarding which he might demand accommodation. It should thus be apparent that it is the facts in this context which are crucial, since a finding that defendant laid off its IT staff for valid reasons would be fatal to plaintiff's claims, under any analysis. As discussed below, this court concludes that defendant did, in fact, lay off plaintiff for valid business reasons.

This court notes parenthetically that its discussion of plaintiff's first requested accommodation, to be allowed to work remotely from Mississippi, is based upon *his* version of the facts of this case, and not defendant's. Indeed, defendant does not provide extensive arguments on this issue, since it contends that:

> there is no evidence Locastro asked White for any accommodation in 2016 when White asked if he would relocate to Iowa. Locastro Dep. at 160–161, 171. Therefore, there was no need for White Communications to go through the interactive process.

[Reply brief at 12]. This court cannot agree with defendant on this point. While it is, in fact, arguable that plaintiff never specifically requested accommodation with regard to the issue of working remotely, this court will assume, for the purposes of this order, that he *implicitly* requested to be allowed to work from Mississippi when he refused White's request that he relocate.

The Fifth Circuit has recognized that "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee ... to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996). In this case, this court tends to agree with plaintiff that, when he rejected White's request to move to Iowa based on his son's disability, it should have been quite apparent to defendant what sort of accommodation he was seeking, namely to continue to work remotely from Mississippi. This court will therefore assume that plaintiff did, in fact, ask for accommodation on this issue, and it will focus on the reasonableness of his request.

In evaluating the reasonableness of any potential accommodation in this case, it is essential to consider the question of timing. In its brief, defendant readily acknowledges that,

when it first hired plaintiff in 2014, it needed him to perform IT services remotely from Mississippi and that he was hired with that specific understanding in mind. Moreover, at the time plaintiff was hired, discussions regarding a potential tech acquisition with Synergies had not even begun, and there was accordingly no need for defendant to consider the implications of that acquisition upon its IT needs. By mid-August 2016, however, it had become clear to defendant that the pending tech acquisition would require mass lay-offs and, according to plaintiff, HR manager Beau Blanchard informed him in a phone call of the pending layoffs and that he would be in the first round. [Plaintiff's Dep. at 111].

Significantly, plaintiff testified that Blanchard informed him that the layoffs would include several departments other than the IT department, including the training, recruiting, and accounting departments. [Id. at 112]. In the court's view, this evidence buttresses defendant's argument that the layoffs were based upon legitimate business needs which had nothing to do with plaintiff's disability, or that of his son. In his brief, plaintiff notes that many of White's employees who were laid off found new jobs with Synergies, but this court regards this fact as immaterial for the purposes of this lawsuit. [Plaintiff's brief at 10]. Synergies is not a defendant in this case, and plaintiff is not seeking a court order directing that company to offer him a job. Plaintiff is, rather, seeking a court order directing White to give him his old job back, and thereby make him its only salaried IT employee, even though the company made a business decision that it should no longer employ salaried IT workers at all. That being the case, plaintiff's evidence regarding hiring decisions made by a completely different company strikes this court as quite irrelevant.

It is undisputed that, after defendant decided to lay off its IT staff after the tech acquisition, it elected to use a local company called MPA as an independent contractor to meet

its IT needs, with payment based upon the amount of services provided, rather than a fixed salary.[2]  In his brief, plaintiff attempts to utilize this fact to cast doubt upon defendant's arguments, writing that:

> In his signed statement sent to the EEOC, Jeff White stated that, "White Communications no longer employs any information technology personnel."  While it is true that MPA, which replaced Locastro, is an independent contractor, this statement is certainly misleading. In his deposition, Jeff White admitted that he employed MPA to provide IT services for White Communications after Locastro was terminated.

[Plaintiff's brief at 14].  Plaintiff thus suggests that the (unsurprising) fact that defendant still had IT needs after the tech acquisition, and that it chose MPA to meet those needs, somehow suggests that it should have retained him as a salaried employee.  This court disagrees.  Without question, there are clear cost advantages to using an independent contractor to provide services only when needed, as opposed to paying a salaried employee a fixed salary, regardless of the amount of work performed.  As noted previously, plaintiff made it clear, when seeking disability benefits, that he only worked an hour a day and that working remotely allowed him to deceive defendant about the amount of work he was performing.  In light of this testimony, it would be difficult indeed for plaintiff to argue, with a straight face, that continuing this arrangement would allow defendant to meet its IT needs as well as its relationship with MPA does.

The most proof plaintiff can offer on this issue is an April 2016 email in which MPA's owner David Birchmier proposed to Jeff White that his company work in tandem with plaintiff to provide IT services.  [Exhibit 19].  In his email, Birchmier wrote that "I think we could be a great partner to White Communications and work in tandem with Tony [Locastro] to ensure your backbone network and servers are fully supported and maintained."  [Id.].  In his brief, plaintiff

---

[2] At the time plaintiff was fired, MPA had already been providing some IT services to defendant, to complement the remote services provided by plaintiff.

writes that "[c]learly the plan was for MPA to work with Locastro to provide the IT services for White Communications … [but] after Locastro refused to move to Iowa, the offer changed to MPA replacing Locastro, not working with him." [Plaintiff's brief at 13]. For its part, however, this court finds it quite unsurprising that Birchmier did not brazenly propose, in a sales pitch, that defendant fire its entire IT staff in favor of MPA, and, at any rate, the April 2016 email was sent months before the tech acquisition with Synergies went forward.

Moreover, it should be clear that any preliminary proposals or plans by no means serve to establish that those plans would meet defendant's business needs as well as the contractual arrangement with MPA eventually did. This conclusion is strengthened by defendant's proof that, in 2017, it paid MPA approximately $30,524 for its IT needs, whereas prior to the tech acquisition, it was paying Locastro a salary of approximately $67,000 per year. [Defendant's exhibit "P"; White Dep. at 30; Locastro Dep. at 76.] Even with that salary, defendant found it necessary to pay MPA additional amounts to perform tasks that plaintiff could not, and the proof of cost savings involved with the new arrangement thus strikes this court as overwhelming. This court further notes that MPA is not a defendant in this case, and plaintiff is not seeking an order compelling that company to hire him as an employee. Rather, plaintiff is seeking a court order directing White Communications to retain him as a salaried employee, even though it made a business decision to no longer have any salaried IT employees. Plaintiff offers no evidence whatsoever that this major restructuring was made to provide legal "cover" for a decision to fire him, and it seems clear to this court that it was not.[3] This court therefore concludes that plaintiff's request that he be retained as defendant's only salaried IT employee is contrary to

---

[3] In addition to the obvious costs savings involved, this court notes once again that discussions regarding the tech acquisition with Synergies began long before plaintiff's job appeared to be in any jeopardy.

defendant's essential business needs, and, accordingly, does not represent a reasonable accommodation in this case.

This court now turns to the second major accommodation which plaintiff is seeking in this case, namely that he be allowed to continue working remotely from Mississippi. As noted previously, this court has few arguments from defendant on this issue, since it maintains that plaintiff never actually requested a reasonable accommodation to continue working remotely. As discussed previously, however, this court disagrees, and it will accordingly proceed to a discussion of whether such a request was reasonable. This court notes that defendant appeared willing to grant plaintiff such an accommodation for the two months after plaintiff refused, in June 2016, to move to Iowa, but it is far from clear to this court that it was legally required to do so.

In so stating, this court emphasizes that plaintiff himself does not appear to question that Jeff White's need for him to provide non-remote services was a genuine one. In his deposition, plaintiff testified that White decided in "late 2015" that he needed an IT manager who could also act as his personal IT assistant by performing personal, non-remote IT services. In his brief, plaintiff summarizes his deposition testimony on this issue as follows:

> In late 2015, Jeff White approached Locastro, and asked him if he would consider moving to Iowa and making it a permanent thing. [Ex. "1," Locastro depo., p. 80] After that, Jeff White broached the topic on other occasions. [Ex. "1," Locastro depo., p. 81] Jeff White told Locastro of his desire to have his own personal IT assistant in Bloomfield because of the cost of IT services. [Ex. "1," Locastro depo., p. 86]

[Plaintiff's brief at 6]. Plaintiff notes that White even sought to arrange a trailer in Iowa for him to live in, writing that:

> On one visit to Iowa, around late Spring/early Summer, Jeff White wanted Locastro to see a trailer he owned, and wanted Locastro to consider renting it. [Ex. "1," Locastro depo., p. 81]. Locastro considered Jeff White's offer, and discussed it with his wife, and even met with a realtor on one occasion. [Ex. "1," Locastro depo., pp. 82, 84]. However,

Locastro and his wife were very concerned about how their last relocation to Fort Campbell had negatively affected their autistic son. [Ex. "1," Locastro depo., pp. 82, 86].

[Id.].

Thus, plaintiff testified that White was sufficiently eager for him to relocate to Iowa that he made personal arrangements to secure him a place to live there. This strikes this court as the actions of an individual who wanted to retain plaintiff as an employee, but who had developed a legitimate business need for him to begin performing additional tasks closer to the home office. It seems clear to this court that, assuming that defendant had developed a legitimate business need for plaintiff to begin performing additional tasks in Iowa, there is no conceivable way in which those tasks could be performed from hundreds of miles away in Mississippi. While it seems possible that plaintiff could have "walked White through" certain IT problems by phone, this strikes this court as quite inefficient, since it would require both White and plaintiff to spend additional time on issues which could be handled much more rapidly by a single technician in Iowa. Indeed, the very fact that White made such efforts to persuade plaintiff to move to Iowa suggests to this court that his need for him to relocate was genuine, and plaintiff's briefing does not dispute that this is the case. Moreover, plaintiff concedes that White cited concerns about IT costs as motivating his request for him to relocate, and it is quite apparent that reducing costs is an "essential" business need.

The Fifth Circuit has made it clear that "[t]he ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999); *see also Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997) ("We cannot say that [an employee] can perform the essential functions of the job with reasonable accommodation, if the only successful accommodation is for

[the employee] not to perform those essential functions."). *See also E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 698 (5th Cir. 2014).

It strikes this court that, in arguing that he should be allowed to continue working remotely, plaintiff is seeking the sort of accommodation against which the Fifth Circuit cautioned in *Burch*. Namely, plaintiff is seeking for this court to require defendant to pay someone else to do the non-remote services which, Jeff White made clear to plaintiff, he needed him to start performing. However, that is not a reasonable accommodation, as a matter of law, under *Burch* and similar decisions. Once again, plaintiff does not contest that White's need for him to perform these additional services in Iowa was a sincere and legitimate one which arose beginning in late 2015. Plaintiff appears to disparage White's request that he serve as his "personal IT assistant," but this court regards this as an entirely legitimate business need. Indeed, as a frequent user of its own excellent IT staff, it is certainly understandable to this court that White would have decided that he wanted plaintiff to assume this role, since many IT needs cannot be met remotely.

It appears to this court that the most plaintiff can argue on this point is that he was first hired in 2014 with a different arrangement in mind, but nothing in the ADA serves to "lock in" a particular business arrangement, if the employer develops a legitimate business need for an employee to provide additional services. Moreover, plaintiff's argument that he should be allowed to continue his existing arrangement seems particularly inappropriate in this case, considering the massive restructuring which occurred in defendant's IT department around the time plaintiff was fired. It strikes this court that, during a time of massive layoffs, plaintiff is not in a position to reasonably demand that he not only be spared from the layoffs, but that he be

allowed to continue working remotely, when his employer had made it clear he needed him to relocate.

In light of the foregoing, it seems quite possible, if not likely, that White could have lawfully fired plaintiff after he refused to move to Iowa, based on that refusal alone. In so stating, this court emphasizes that federal law does not bar employers from firing their employees because of their disability, in cases where that disability, even with reasonable accommodations, precludes them from performing the essential tasks of their job. The Fifth Circuit recently reiterated this point in one of this court's own cases, involving an individual represented by plaintiff's counsel in this case. In *Pegues v. Mississippi State Veterans Home*, 736 F. App'x 473, 475 (5th Cir. 2018), the Fifth Circuit affirmed a jury's verdict in favor of a veteran's hospital which had fired a direct care worker who, because of her disability, had been unable to perform the required functions of her job, which included lifting patients off their beds.[4]

In the court's view, Locastro finds himself in a position similar to that of the plaintiff in *Pegues* since, because of his (or his son's) disability, he was not in a position to meet his employer's need for an IT manager who could provide non-remote services in Iowa. Of course, it is possible that, in electing to retain plaintiff for two months after he refused to move to Iowa, White had decided that it was not an "essential" business need for him to relocate. It is unnecessary for this court to speculate on this issue, since it is clear that plaintiff is seeking

---

[4] This court notes parenthetically that, while it allowed *Pegues* to go to the jury, there were very important factual differences between that case and the instant one, since Pegues did not repeatedly testify that she was unqualified for her position. Moreover, there was no question in that case that there was a connection between her disability and her refusal (and inability) to perform certain tasks which her employer requested of her.

two major accommodations for his disability, and their combined weight clearly renders his request for accommodation an unreasonable one.

Plaintiff argues that defendant should have engaged in an "interactive process" to determine if any reasonable accommodation were available, *see, e.g. E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009), but this court cannot fault defendant on this point. As noted previously, the record is clear that Jeff White had tried to encourage plaintiff to move to Iowa for months, including by helping him to find a place to live. That alone strikes this court as an "interactive process," but, at the end of the day, plaintiff told White that he would remain in Mississippi. That being the case, this court can discern no further use for an "interactive process" in this context, beyond the efforts which White had already made. Moreover, in light of defendant's decision to lay off its entire IT staff, this court can discern no "middle ground" by which plaintiff might have been allowed to continue working as a salaried employee, when defendant had made a business decision to completely restructure its IT department, for business reasons which had nothing to do with plaintiff's disability.

In light of the foregoing, this court concludes that allowing plaintiff to continue working remotely from Mississippi as a salaried employee was not a reasonable accommodation, even based upon what defendant knew at the time. That is, Jeff White knew that he had a legitimate business need, under the "new" company structure, to reduce costs by eliminating all salaried IT employees, including plaintiff's position. Furthermore, White knew that, even before that need arose, he had expressed a need for plaintiff to begin providing more IT services in Iowa and that plaintiff had refused this request. Thus, White knew that there was no reasonable accommodation which would allow plaintiff to meet his company's essential business needs,

and, that being the case, there is nothing in the ADA which prevented him from firing plaintiff. This is, once again, based solely upon what White knew at the time.

In the court's view, the reasonable accommodation issue becomes even more overwhelmingly in favor of defendant if one is allowed to additionally consider information that White did *not* know at the time, but which has been conclusively established during discovery in this case. These newly discovered facts include the facts that, at the time he was fired, plaintiff 1) had begun losing the ability to focus on his work, 2) was losing all interest in computers and technology, 3) was only working an hour a day, and, 4) that working remotely allowed him to deceive his employer regarding the deficiencies in his ability to do his job. In the court's view, the fourth factor is the most compelling one, both with regards to the reasonable accommodation issue itself, and also the related issue of whether plaintiff's deception should be considered after the fact. Indeed, even assuming for the sake of argument that courts should ordinarily not consider facts on the reasonable accommodation issue which were unknown to the employer at the time,[5] this rule seems quite suspect if it is extended to an employee's willful deception of his employer. Otherwise, the plaintiff would essentially be rewarded for a successful deception of his employer, by obtaining a court order allowing him to continue a work arrangement which is fundamentally dishonest in nature.

In light of the foregoing, this court concludes that allowing plaintiff to continue working remotely from Mississippi was not a reasonable accommodation in this case, based upon the facts known to defendant at the time, and certainly not under the facts subsequently revealed in discovery. As a final point on this issue, this court notes that, in his brief, plaintiff attempts to

---

[5] The parties' briefing does not address the issue of whether this is the general rule or not, and this court is unaware of whether it is.

demonstrate that, in firing him, White was motivated by some sort of animus against his (or his son's) disability. Specifically, plaintiff argues that his formerly close relationship with White soured after he told him that he would be unable to move to Iowa, writing that:

> On June 14, 2016, Locastro told Jeff White again, this time via email, that he could not relocate to Iowa. [Ex. "1," Locastro depo., p. 91; Ex. "11," Email dated June 14, 2016] Jeff White never responded to the email. [Ex. "1," Locastro depo., p. 94] After the June 14 email, Jeff White's attitude towards Locastro changed. [Ex. "1," Locastro depo., p. 94] Before the email, they were close; but afterwards, Jeff White rarely communicated with Locastro. [Ex. "1," Locastro depo., p. 94] Locastro felt uncomfortable anytime he went to Iowa. [Ex. "1," Locastro depo., p. 95]

[Plaintiff's brief at 6-7]. Even accepting this testimony as accurate, however, this court does not regard it as supportive of plaintiff's ADA claims. Once again, the ADA does not prevent an employer from firing an employee who is unable to meet the essential needs of his position, even with reasonable accommodations. Thus, even assuming that White believed that plaintiff's days with the company were numbered after he refused his request to move to Iowa, there is nothing in the ADA which prevented defendant from firing him on this basis, if it had an "essential" business need for plaintiff to begin performing tasks closer to the home office. It appears to this court that it did.

This court further notes that the fact that White was not motivated by any animus against the disabled seems clear enough under plaintiff's version of the facts. Indeed, plaintiff makes clear that he fully informed White of both his and his son's disability when he was first hired in 2014 and that White assured him that would not be a problem. Specifically, plaintiff writes in his brief that:

> The interview was conducted at Jeff White's house. [Ex. "1," Locastro depo., p. 51] During the interview, Locastro told Jeff White about his military career, the disabilities that he had suffered while in the military, and his son's autism. [Ex. "1," Locastro depo., pp. 51, 57-58] Locatro told Jeff White that he had been electrocuted in the military, and now his disabilities affect his daily activities. [Ex. "1," Locastro depo., pp. 52-53] Locastro told Jeff White that he had difficulty standing on his feet for long periods of

time because of the pain he suffered. [Ex. "1," Locastro depo., p. 53] Locastro also told Jeff White that he had received mental health treatment, had PTSD, and was unable to be around people for long periods of time, or be in a stressful environment. [Ex. "1," Locastro depo., pp. 53-54] Locastro explained that working remotely was all he was able to do, and it would be very difficult for him to work on site. [Ex. "1," Locastro depo., p. 53] Locastro explained that he could not live in Iowa, and Jeff White told Locastro that was perfectly fine. [Ex. "1," Locastro depo., p. 52].

[Plaintiff's brief at 3-4].

Plaintiff evidently regards this testimony as supportive of his ADA claims, but this court is of the view that it is quite favorable to defendant. Indeed, plaintiff's own testimony suggests that, when defendant first hired him, it was doing what the ADA requires employers to do, namely give equal opportunities to disabled individuals who, with reasonable accommodations, are able to perform the essential duties of the position. The fact that plaintiff enjoyed a "close" relationship with Jeff White for years, in spite of his knowledge of his disabilities, suggests that White harbored no animus against the disabled, but merely had certain business needs which he had to ensure were met. It further seems clear that, when White first broached the topic of plaintiff moving to Iowa in late 2015, he was not acting out of some newfound animus against the disabled, but out of a realization that the company needed an IT manager who could perform additional non-remote services, regardless of whether that individual was disabled or not. That being the case, when defendant eventually fired plaintiff in August 2016, it seems clear that it did so based on a quite reasonable conclusion that allowing him to continue to work as a salaried employee from Mississippi would not meet its essential business needs of reducing IT costs.

In his brief, plaintiff relies upon inconsistencies in Jeff White's prior statements about when he learned of his disability, but this court does not believe that any such inconsistency assists plaintiff in meeting his burden of proof in this case. For the purposes of this order, this court is assuming that plaintiff is correct in stating that he told White of his disability, and that of

his son, when he was first hired in 2014. As discussed above, however, plaintiff himself testified that White assured him that such disability would not be a problem, and nowhere in plaintiff's brief does he argue that White's stated need, beginning in late 2015, for him to start performing non-remote services in Iowa was anything other than a genuine one. This court therefore does not regard plaintiff's own version of the facts as supporting an inference that White was motivated by unlawful animus against the disabled in terminating him.

In his brief, plaintiff argues that White testified untruthfully regarding certain other matters, but, in this court's view, none of these alleged inconsistencies cast doubt upon the central evidence in this case. In particular, none of plaintiff's impeachment evidence casts doubt upon the basic facts that: 1) a tech acquisition took place between defendant and Synergies, based upon negotiations which first began in 2015; 2) this tech acquisition resulted in layoffs in multiple departments in defendant's company, including its entire IT department; 3) objective financial data indicates that defendant's decision to outsource IT services to MPA resulted in large cost savings compared to paying plaintiff his $67,000 yearly salary; and 4) plaintiff's own sworn statements indicate that his remote working arrangement helped conceal the facts that he was unable to do his job and was only working an hour a day. None of these facts are dependent upon White's credibility, and they strongly support defendant's assertion that legitimate business needs supported its decision to terminate plaintiff's employment.

Regardless of whether this evidence is best considered in the context of reasonable accommodation, or simply as evidence of why plaintiff was terminated, it clearly supports defendant's motion for summary judgment. Indeed, it is arguable that the issue of plaintiff's refusal to relocate is a red herring in this case, since defendant did, in fact, allow plaintiff to continue working from Mississippi, until massive layoffs occasioned by the tech acquisition with

Synergies took place. It may well be that this case is simply one where plaintiff was terminated for a lawful reason and, up until that time, was granted any accommodations he sought, whether defendant was legally required to do so or not. While there are thus multiple ways of analyzing this issue, they all lead to the same conclusion, namely that defendant acted within its legal rights in terminating plaintiff's employment. Defendant's motion for summary judgment will therefore be granted.

## III. Additional factual and legal weaknesses in plaintiff's case

While this court's conclusions on the previous two issues are each independently dispositive, it will note, for the record, certain additional factual and legal weaknesses in plaintiff's case which may become relevant in the event that the Fifth Circuit disagrees with its findings stated above. In the court's view, one such weakness involves the manner in which, throughout plaintiff's brief, he repeatedly asserts that he was fired for refusing to move to Iowa, as if that necessarily involves an allegation of disability discrimination. For example, plaintiff writes at one point in his brief that "he knew the real reason he was being terminated was because he was not willing to move to Iowa." [Plaintiff's brief at 9, citing Locastro depo., p. 119]. The problem with that assertion is that plaintiff filed suit under a federal statute which bars discrimination against workers because they are disabled, not because they refuse to move to Iowa. Clearly, many employees are unwilling to relocate to a distant location, regardless of whether they are disabled or not, and it would be improper to conflate the two as a matter of law.

In his brief, plaintiff does offer some arguments that his refusal to move to Iowa was based on his own disability or that of his son, but there are notable factual and legal weaknesses

with regard to each. With regard to plaintiff's own disability, the proof indicates that he made repeated trips to Iowa during his tenure with the company, which certainly suggests that the travel itself was not an impediment for him. Moreover, it appears that plaintiff himself did not, at least initially, regard any disability as necessarily precluding a move to Iowa, since he carefully considered such a move for a number of weeks. In his brief, plaintiff argues that it would have been a "big hassle" for him to transfer his VA disability benefits to Iowa, based on the fact that the VA had a lengthy backlog in Iowa. [Plaintiff's brief at 7, plaintiff's depo. at 106]. However, it is far from clear to this court that inconvenience in transferring benefits is sufficient to state a claim under the ADA, and plaintiff offers no authority whatsoever indicating that it is.

For its part, defendant suggests that the real reason plaintiff did not want to relocate was because he knew that, if he was facing closer supervision in Iowa, it would be more difficult for him to continue to hoodwink his employer into believing that he was working for more than an hour a day. [Defendant's brief at 19]. Given plaintiff's sworn statements that he was engaged in a sustained deception of his employer in this regard, and that his working remotely facilitated it, this strikes this court as being a quite reasonable inference from the evidence. This court is unable to make such a factual inference in defendant's favor on summary judgment, however, and it will therefore merely note the issue for the record.

Factually speaking, plaintiff appears to have a stronger argument that his son's autism precluded a move to Iowa since, he testified, the child had experienced difficulties with a prior move. [Plaintiff's depo. at 156]. Legally speaking, however, the Fifth Circuit has not

recognized the theory of associational disability discrimination at all,[6] and it is unclear whether it would recognize this theory in cases involving a plaintiff's refusal to relocate based upon concerns about a relative's disability. Indeed, this court notes that plaintiff cites no "refusal to relocate" cases at all in his brief, which certainly seems like a significant omission in a case in which he repeatedly argues that his refusal to relocate to Iowa resulted in a termination which was contrary to the ADA. Even assuming that the Fifth Circuit would recognize the theory of associational disability discrimination in the refusal to relocate context, it is unclear to this court whether that court would require formal medical proof that a relocation was inadvisable in light of a relative's disability. Indeed, it is "easy to argue" that a move to a certain location would cause harm to a relative with a history of autism, depression or other such disability, but the Fifth Circuit might well conclude that, before the ADA is interpreted as covering refusals to relocate on this basis, stronger proof than the plaintiff's own testimony should be required.

In so stating, this court acknowledges that being asked to move from Mississippi to Iowa, and to uproot one's life in the process, is a great deal for a company to ask of any employee. That is not the question in this lawsuit, however. The question in this case is the circumstances under which a federal statute passed by Congress to protect the disabled should be inferred as authorizing a federal claim in cases where an individual is allegedly fired for refusing to move to a new location, with nothing more than his own assertion that the reasons for such refusal were a relative's disability. While it is possible that the Fifth Circuit would excuse the weaknesses in

---

[6] It appears likely to this court that the Fifth Circuit would recognize this theory in at least some circumstances. *See Grimes v. Wal–Mart Stores Texas, L.L.C.,* 505 Fed.Appx. 376, 380 n.1 (5th Cir. 2013) (noting that "[t]he Fifth Circuit has not explicitly recognized a cause of action for discrimination based on association with a handicapped individual, nor [has it] described what such a claim requires," but noting that "[d]istrict courts within this Circuit have . . . recognized a cause of action for associational discrimination.").

plaintiff's proof and legal authorities on this issue, it is far from clear to this court that it would. This court can thus discern a number of weaknesses in plaintiff's proof in this context, but it will stop short of actually granting summary judgment on this basis. Indeed, plaintiff is able to make reasonable policy arguments of his own in this context, and this court will therefore simply note for the record that these issues exist, that they are an obstacle to any eventual recovery by plaintiff in this case, and the Fifth Circuit may address them as it sees fit in the event that it disagrees with this court's conclusion that summary judgment is in order on the first two issues discussed above.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is granted.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

So ordered, this, the 14th day of January, 2019.

/s/ Michael P. Mills
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**